**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| SARAH ROCKRIVER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:18CV954 |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social | ) | |
| Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Sarah Rockriver, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 7 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 10, 12; see also Docket Entry 11 (Plaintiff's Memorandum); Docket Entry 13 (Defendant's Memorandum)). For the reasons that follow, the Court should enter judgment for Defendant.

---

[1] The United States Senate confirmed Andrew M. Saul as the Commissioner of Social Security on June 4, 2019, and he took the oath of office on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Nancy A. Berryhill as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I. PROCEDURAL HISTORY

Plaintiff applied for DIB, alleging a disability onset date of October 15, 2009. (Tr. 178-83.) Upon denial of that application initially (Tr. 69-87, 114-17) and on reconsideration (Tr. 88-110, 120-27), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 128-30). Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing. (Tr. 36-68.) The ALJ subsequently determined that Plaintiff did not qualify as disabled under the Act. (Tr. 15-29.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 14, 329-76), and Plaintiff filed an action in this Court seeking judicial review of the Commissioner's final decision denying benefits, see Rockriver v. Colvin, No. 1:15CV811, Docket Entry 1 (M.D.N.C. Sept. 30, 2015).

While Plaintiff's civil action remained pending, she filed a second application for DIB on November 16, 2015, alleging disability since June 18, 2014. (Tr. 1855-56.) Following denials of Plaintiff's second DIB application initially (Tr. 1715-34) and on reconsideration (Tr. 1735-55), Plaintiff requested a hearing before an ALJ (see Tr. 1761 (showing "October 31, 2016" as likely date of Plaintiff's request for hearing, although erroneously referring to that date as filing date of Plaintiff's second DIB claim)). In the meantime, pursuant to the Commissioner's Motion

to Remand under Sentence Four of 42 U.S.C. § 405(g), Rockriver, Docket Entry 14 (M.D.N.C. June 6, 2016), the Court remanded Plaintiff's first claim for DIB to the Commissioner for further administrative proceedings, including reevaluation of the treatment notes and opinions from Drs. John C. Pittman and Thomas M. Motyka, Rockriver, 2016 WL 5957567 (M.D.N.C. Oct. 12, 2016) (unpublished) (Peake, M.J.), recommendation adopted, slip op. (M.D.N.C. Feb. 14, 2017) (Tilley, S.J.). The Appeals Council then entered an Order remanding Plaintiff's first DIB claim to an ALJ for further consideration of the opinions of Drs. Pittman and Motyka, Plaintiff's Lyme disease, and maximum residual functional capacity. (Tr. 1756-62.) The Appeals Council also noted that its remand of Plaintiff's first DIB claim rendered her second such claim "duplicative," and ordered the ALJ to "consolidate the claims files." (Tr. 1761.)

A different ALJ held a new hearing, which Plaintiff, her attorney, and a VE attended. (Tr. 1636-84.) Following the hearing, the ALJ determined that Plaintiff did not qualify as disabled at any time from October 15, 2009, to the date of the ALJ's decision on July 24, 2018. (Tr. 1611-27.) Plaintiff then filed the instant action seeking judicial review of the ALJ's decision in this Court.[2]

---

[2] "[W]hen a case is remanded by a [f]ederal court for further consideration, the decision of the [ALJ] will become the final decision of the Commissioner

In rendering that decision, the ALJ made the following findings:

1. [Plaintiff] meets the insured status requirements of the . . . Act through December 31, 2018.

2. [Plaintiff] has not engaged in substantial gainful activity since her alleged onset date of October 15, 2009.

. . .

3. [Plaintiff] has the following severe impairments: degenerative disc disease; hypertension; hypotension; breast cancer; recurrent Lyme disease; bacterial/viral infections; babesiosis; vertigo; polyneuropathy; myofascial muscle pain; fibromyalgia; chronic fatigue syndrome; chronic pain syndrome; insomnia; depressive disorder; and anxiety disorder.

. . .

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [Plaintiff] has the residual functional capacity to perform light work . . . except she can frequently push/pull and operate foot and hand controls with the lower and upper extremities; occasionally climb ramps or stairs; never ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; frequently reach, reach overhead, handle objects, and finger bilaterally; have occasional exposure to extreme heat and vibration; have occasional exposure to

---

after remand on [a claimant's] case unless the Appeals Council assumes jurisdiction of the case. The Appeals Council may assume jurisdiction based on written exceptions to the decision of the [ALJ] which [a claimant] file[s] with the Appeals Council or based on its authority . . . to assume jurisdiction of [a claimant's ] case even though no written exceptions have been filed." 20 C.F.R. § 404.984. Here, the record reflects neither that Plaintiff filed written exceptions to the ALJ's decision with the Appeals Council nor that the Appeals Council assumed jurisdiction of her case under its own authority.

pulmonary irritants such as dusts, odors, fumes, and gases and to poorly ventilated areas; have no exposure to unprotected heights; and have occasional exposure to hazardous machinery or hazardous moving mechanical parts. [Plaintiff's] work is limited to simple, routine and repetitive tasks but not at a production rate pace; simple work-related decisions; and frequent interaction with the public, co-workers and supervisors. She would be off task up to, but not including, 10% of the time in an eight-hour workday, in addition to normal breaks (with normal breaks defined as a 15 minute morning and afternoon break and a 30 minute lunch break).

. . .

6. [Plaintiff] has no past relevant work.

. . .

10. Considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform.

. . .

11. [Plaintiff] has not been under a disability, as defined in the . . . Act, at any time since October 15, 2009, the alleged onset date of disability.

(Tr. 1616-27 (bold font and internal parenthetical citations omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of . . . review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).

Plaintiff has not established entitlement to relief under the extremely limited review standard.

## A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ,

as adopted by the Social Security Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Social Security Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]  "To regularize the

_____

[3] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons.  The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant

adjudicative process, the Social Security Administration has . . .
promulgated . . . detailed regulations incorporating longstanding
medical-vocational evaluation policies that take into account a
claimant's age, education, and work experience in addition to [the
claimant's] medical condition." Id. "These regulations establish
a 'sequential evaluation process' to determine whether a claimant
is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five
steps: "The claimant (1) must not be engaged in 'substantial
gainful activity,' i.e., currently working; and (2) must have a
'severe' impairment that (3) meets or exceeds the 'listings' of
specified impairments, or is otherwise incapacitating to the
extent that the claimant does not possess the residual functional
capacity to (4) perform [the claimant's] past work or (5) any other
work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d
473, 475 n.2 (4th Cir. 1999).[4] A finding adverse to the claimant
at any of several points in the SEP forecloses an award and ends
the inquiry. For example, "[t]he first step determines whether
the claimant is engaged in 'substantial gainful activity.' If the
claimant is working, benefits are denied. The second step

here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations
omitted).
[4] "Through the fourth step, the burden of production and proof is on the
claimant. If the claimant reaches step five, the burden shifts to the
[government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[5] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work

---

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

experience) to adjust to a new job."  Hall, 658 F.2d at 264-65.

If, at this step, the government cannot carry its "evidentiary

burden of proving that [the claimant] remains able to work other

jobs available in the community," the claimant qualifies as

disabled.  Hines, 453 F.3d at 567.[6]

## B.  Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's

finding of no disability on these grounds:

1) "[t]he ALJ engaged in cherry-picking and inconsistent

logic to give the long time treating doctor's [sic] little weight"

(Docket Entry 11 at 7 (bold font and single-spacing omitted and

standard capitalization applied)); and

2) "[t]he ALJ fails to build a logical bridge between the RFC

assigned and the disjointed recitation of [Plaintiff's] medical

history" (id. at 31 (bold font and single-spacing omitted and

standard capitalization applied)).

Defendant contends otherwise and seeks affirmance of the

ALJ's decision.  (See Docket Entry 13 at 4-21.)

---

[6] A claimant thus can qualify as disabled via two paths through the SEP.  The
first path requires resolution of the questions at steps one, two, and three in
the claimant's favor, whereas, on the second path, the claimant must prevail at
steps one, two, four, and five.  Some short-hand judicial characterizations of
the SEP appear to gloss over the fact that an adverse finding against a claimant
on step three does not terminate the analysis.  See, e.g., Hunter, 993 F.2d at
35 ("If the ALJ finds that a claimant has not satisfied any step of the process,
review does not proceed to the next step.").

## 1. Treating Physicians' Opinions

In Plaintiff's first assignment of error, she contends that "[t]he ALJ engaged in cherry-picking and inconsistent logic to give the long time treating doctor's [sic] little weight." (Docket Entry 11 at 7 (bold font and single-spacing omitted and standard capitalization applied).)   More specifically, Plaintiff asserts that the ALJ erred in according little weight to the opinions of Drs. Thomas M. Motyka and John C. Pittman because 1) "[t]he ALJ's medical narrative is based on cherry-picked evidence in violation of Lewis[ v. Berryhill, 858 F.3d 858 (4th Cir. 2017)] and Brown[ v. Commissioner of Soc. Sec. Admin., 873 F.3d 251 (4th Cir. 2017)]" (Docket Entry 11 at 11), 2) "[t]he medical source opinions of Dr. Motyka and Dr. Pittman are supported by their medical records" (id. at 24 (standard capitalization applied)), 3) "[t]he ALJ failed to provide any nexus between [Plaintiff's] normal range of motion and muscle testing, [her] tick-borne illness, and the assessed limitations" of Drs. Motyka and Pittman (id. at 26 (standard capitalization applied)), 4) the ALJ failed to acknowledge that Plaintiff's pain "was [] not in control at times" (id. at 27 (standard capitalization applied)), and 5) "[t]he ALJ's citation to Dr. [Kathy K.] Yu's letter ignores the plain language of the letter" (id. at 28 (standard capitalization applied)).   As

discussed in more detail below, Plaintiff has failed to demonstrate an entitlement to reversal or remand.

On November 30, 2011, Dr. Motyka completed a "Medical Source Statement Concerning the Nature and Severity of an Individual's Physical Impairment" ("Motyka/Pittman MSS") (Tr. 1607-10) on which he opined that Plaintiff "ha[d] not been capable of performing sustained sedentary work on a regular and continuing basis, *i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule" (Tr. 1607) since April of 2008 (Tr. 1609), and that granting Plaintiff "the freedom to alternate sitting and standing during the work day" would not have changed his aforementioned opinion (Tr. 1608). Dr. Motyka further indicated that Plaintiff's "pain and/or other subjective symptoms" would "[n]ot [s]ignificant[ly]" impact her "ability to maintain attention and concentration for extended periods," but would have a "[m]oderately [s]evere" impact on her "ability to perform activities within a schedule, maintain regular attendance and be punctual," and a "[s]evere" impact on her "ability to complete a normal workday and workweek without interruptions from medically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 1609.) On April 5, 2014, Dr. Pittman stated: "I agree with the about [sic] medical status assessment." (Tr. 1610.)

The ALJ accorded the Motyka/Pittman MSS "little weight" based upon the following analysis:

> The[ Motyka/Pittman MSS's] opinions are not supported by explanations and are not consistent with the medical and other evidence in the record, as described [earlier in the ALJ's decision]. [Plaintiff] generally had full range of motion, a normal gait, and intact strength. Moreover, at points in the record, she reported that her medication was effective in controlling her pain. Of note, on November 30, 2011, Dr. Motyka assessed [Plaintiff] as well nourished and not in acute distress, with supple neck, soft abdomen, intact judgement/insight, appropriate mood/affect, and full range of motion in the upper and lower extremities. Finally, the [ALJ] notes the observations of Dr. Yu that [Plaintiff] did not seem to have any difficulty sitting, standing, walking, handling objects, hearing, or speaking during Dr. Yu's interactions with her.

(Tr. 1625 (internal citations omitted).)

    a.  Cherry-Picked Evidence

Plaintiff first contends that the ALJ's finding that the Motyka/Pittman MSS's opinions lacked "consisten[cy] with the medical and other evidence in the record" (id.) resulted from the ALJ's cherry-picking of evidence unfavorable to Plaintiff. (See Docket Entry 11 at 12-24.) With respect to Dr. Motyka, Plaintiff asserts that "[t]he ALJ's medical narrative dance[d] around, largely ignoring . . . or neglecting the[] content" of Dr. Motyka's medical records. (Id. at 12 (referencing Tr. 1620-23).) In particular, Plaintiff faults the ALJ for "cherry-pick[ing] range of motions exams and allegedly 'unremarkable' exams" (id. at 13) while "ignor[ing]" repeated notations of "fatigue and exhaustion"

13

and Plaintiff's "high-risk" opioid use evidenced in Dr. Motyka's records (id. at 18). Regarding Dr. Pittman, Plaintiff maintains that "[t]he ALJ's discussion cherry-picks mentions of improvement while largely ignoring the actual content of the records reflecting significant ups and downs in [Plaintiff's] symptoms." (Id. at 19.) Plaintiff provides extensive, chronological summaries of what she terms the "actual findings" (id. at 13, 19) of Drs. Motyka and Pittman that Plaintiff believes support the restrictions on the Motyka/Pittman MSS (see id. at 13-18, 19-23). Plaintiff contends that "the ALJ also cherry-picked other parts of the record, neglecting to mention many favorable findings from other providers and from [Plaintiff's] own testimony." (Id. at 30 (citing Tr. 1212, 1274, 1653, 1660-61, 1668-69).) Plaintiff's arguments in this regard fail for two reasons.

First, Plaintiff misinterprets this Court's standard of review. The Court must determine whether the ALJ supported his analysis of the Motyka/Pittman MSS with substantial evidence, defined as "more than a mere scintilla of evidence but . . . somewhat less than a preponderance," Mastro, 270 F.3d at 176 (brackets and internal quotation marks omitted), and not whether other record evidence weighs against the ALJ's analysis, Lanier v. Colvin, No. CV414-004, 2015 WL 3622619, at *1 (S.D. Ga. June 9, 2015) (unpublished) ("The fact that [the p]laintiff disagrees with

14

the ALJ's decision, or that there is other evidence in the record that weighs against the ALJ's decision, does not mean that the decision is unsupported by substantial evidence.").

The ALJ here buttressed his finding that the medical evidence did not support the restrictions on the Motyka/Pittman MSS by pointing to largely normal objective findings on examination throughout the relevant time period in this case, such as intact sensation, full strength, normal muscle bulk and tone, only sporadic instances of tenderness to palpation, normal gait, full deep tendon reflexes, intact coordination, full range of motion in all joints, lack of edema, good pulses, as well as negative straight leg raises, Holter monitor test, and knee x-rays. (See Tr. 1620-22; see also Tr. 425-27, 442-43, 481, 557-58, 808, 905-82, 996-97, 1172, 1213, 1418-44, 1518-59, 1947-48, 1990, 2001, 2017-18, 2032-33, 2046, 2058-59, 2072.) The ALJ also afforded "substantial weight" (Tr. 1623) to the opinions of all four state agency medical consultants of record, who each opined that Plaintiff remained capable of performing a reduced range of light work (see Tr. 1623-24; see also Tr. 81-82, 103-05, 1727-28, 1747-49). Moreover, the ALJ assigned "[s]ubstantial weight" to the opinions of both consultative medical examiners, Drs. Lydia Vognar and Jairon Downs (Tr. 1624), who each, after thorough and generally normal examinations, placed no limits on Plaintiff's ability to

sit, no to mild limitation on Plaintiff's ability to lift and carry, and mild to moderate limitations on Plaintiff's ability to stand, walk, and engage in postural activities (see Tr. 1194-99, 1893-1903). The ALJ's analysis thus supplies substantial evidence to support his assignment of "little weight" to the less-than-sedentary restrictions on the Motyka/Pittman MSS (Tr. 1625).

Second, Plaintiff overemphasizes the significance of the evidence she claims the ALJ ignored. Dr. Motyka's notations of fatigue, numbness, weakness, stiffness, vertigo, and pain upon which Plaintiff relies (see Docket Entry 11 at 13-19), do not constitute objective findings on examination but rather Plaintiff's subjective reports of symptoms (see Tr. 905-82, 1418-44, 1518-59). The objective portions of Dr. Motyka's treatment notes reflect normal gait, strength, pulses, reflexes, Babinski tests, straight leg raising tests, and range of motion (see id.), with only one finding of decreased knee range of motion (see Tr. 1553), one notation of difficulty rising from a squat (see Tr. 955), and some findings of tenderness to palpation (see Tr. 913, 917, 949, 961, 970, 1518, 1521, 1524, 1527, 1530, 1533, 1536, 1539, 1542, 1545, 1548).

Plaintiff additionally maintains that the ALJ "ignored" the fact that Dr. Motyka's records reflected Plaintiff's "need[] to take extremely high doses of narcotics for pain control," at levels

"well above the high-risk level set by the [Centers for Disease Control], meaning that [Plaintiff] was actually at an elevated risk for death as a result of [her pain] medications." (Docket Entry 11 at 18 (citing Tr. 1439, and https://www. cdc.gov/drugoverdose/pdf/guidelines_at-a-glance-a.pdf (webpage no longer accessible but similar material found at https://www. cdc.gov/drugoverdose/pdf/calculating_total_daily_dose-a.pdf (last visited Mar. 3, 2020)).) That argument misses the mark, because the ALJ expressly recognized multiple times in his decision that Plaintiff sought treatment with pain management specialists and did not trivialize that treatment or characterize it as "conservative." (See Tr. 1621 (noting that Plaintiff "engaged in pain management treatment throughout th[e] period" from early 2010 to September 2011, that she "continued [in] pain management" for the remainder of 2011, and "received a cortisone injection in the knee" in December 2011, and "continued to report to integrative medicine for pain management" in 2012), 1622 (discussing Plaintiff's repeat "bilateral knee injections for her pain in October 2012" and "follow up with her pain management specialist" thereafter).) Notably, after Dr. Motyka changed his practice to holistic medicine and would no longer prescribe opioids for Plaintiff (see Tr. 2013), she successfully weaned herself off of Oxycodone at the urging of a new pain management specialist in

2015 (see Tr. 1652, 2014, 2028), thus undercutting Plaintiff's claim of a "need to take extremely high doses of narcotics for pain control" (Docket Entry 11 at 18 (emphasis added).

Furthermore, other than Dr. Pittman's examinations of Plaintiff on March 2, 2010, and November 20, 2012, which described Plaintiff as "well[-]developed, "focused," and "in no acute distress" (see Tr. 557-58, 1489-90), Dr. Pittman's treatment notes do not document any objective findings from physical examinations beyond Plaintiff's vital signs (see Tr. 514-91, 767-96, 1009-60, 1388-1415, 1453-1516, 1919-43). Instead, those notes contain lengthy summaries of Plaintiff's subjective reports of symptoms and responses to prior treatment regimes. (See id.)[7]

Plaintiff further objects to the ALJ's failure to expressly discuss a treatment note from Dr. Shawnee D. Weir, an endocrinologist, who "noted the presence of muscle weakness and that [Plaintiff] was having trouble walking" (Docket Entry 11 at 30 (citing Tr. 1212)), a note from Dr. Julia G. Warren Ulanch who "found [Plaintiff] was suffering from significant exhaustion and fatigue" (id. (citing Tr. 1274)), and various statements by Plaintiff during the hearing regarding the impact of her symptoms on her functioning (id. (citing Tr. 1653, 1660-61, 1668-69)). As

---

[7] Of the 27 total treatment notes from Dr. Pittman, 12 reflect consultation only by telephone rather than in-person office visits. (See Tr. 514-91, 767-96, 1009-60, 1388-1415, 1453-1516, 1919-43.)

an initial matter, an ALJ need not discuss every finding in each piece of evidence in making an RFC determination, see Reid v. Commissioner of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (citing Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005)), particularly with a substantially voluminous treatment record, as exists here. More significantly, Dr. Weir did not find muscle weakness and trouble walking during her examination of Plaintiff but merely recorded Plaintiff's subjective complaints of those symptoms in the "History of Present Illness" and "Review of Systems" portions of Dr. Weir's treatment note. (Tr. 1211-14.) Similarly, Dr. Ulanch did not find significant exhaustion and fatigue on examination of Plaintiff, but rather documented Plaintiff's complaints of those symptoms in the "History of Present Illness" and "Review of Systems" portions of Dr. Ulanch's treatment note. (Tr. 1274-77.)

As for Plaintiff's testimony, Plaintiff criticizes the ALJ for "neglecting to mention many favorable findings," such as Plaintiff's statements that fatigue caused her "to hire help for housework and child care," that she performed daily activities "in short increments," and that, "when she was taking [intravenous] antibiotics (over the course of several years from 2010 through 2013), she was spending much of her time lying down with an IV in her arm." (Docket Entry 11 at 30 (citing Tr. 1653, 1660-61, 1668-

69).) With regard to the latter testimony, Plaintiff observes that "[i]t is not clear how the ALJ expected [Plaintiff] to work with an IV in her arm for a substantial part of the day." (Id. at 30-31.)

Respecting Plaintiff's IV use from 2010 to 2013, as the Commissioner notes (see Docket Entry 13 at 10-11 n.4), throughout that time period, Plaintiff variously characterized her ability to engage in daily activities as "ok," "adequate," "good," and "not limited by pain", as well as advised Dr. Motyka that symptom relief from medications enabled her to garden, crochet, walk one mile per day, and "work," without any mention of her IV impeding those endeavors (see Tr. 448, 908, 915, 919, 922, 930, 932, 936, 939, 942, 946, 949, 952, 954, 960, 963, 967, 978, 1418, 1423, 1438, 1533, 1536, 1548, 1555, 1558). Moreover, records from Dr. Pittman reflect that he placed a PICC line in Plaintiff's arm on March 19, 2012 (see Tr. 1014), that Plaintiff had the PICC line removed on June 13, 2012 (see Tr. 1407), that Dr. Pittman reattached the PICC line in October 2012 (see Tr. 1498), and removed it again on May 15, 2013 (see Tr. 1459), thus undermining Plaintiff's claim that "over the course of several years from 2010 through 2013[], she was spending much of her time lying down with an IV in her arm" (Docket Entry 11 at 30 (emphasis added); see also Tr. 1668-69.)[8]

---

[8] Significantly, numerous physicians stated their disagreement with Dr. Pittman's use of intravenous antibiotics to treat Plaintiff's Lyme disease

As to the remainder of testimony Plaintiff claims the ALJ "ignored," the ALJ ultimately found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not entirely consistent with the medical and other evidence of record" (Tr. 1620), and Plaintiff has not challenged the ALJ's finding in that regard (see Docket Entry 11).

Simply put, the ALJ did not cherry-pick the record evidence to support his discounting of the Motyka/Pittman MSS.

b. Supportability of the Motyka/Pittman MSS

Next, Plaintiff contests the ALJ's rationale for concluding that the opinions in the Motyka/Pittman MSS lacked any supporting explanations. (See Docket Entry 11 at 24 (citing Tr. 1625).) According to Plaintiff, both doctors "repeatedly recognized [that Plaintiff] had problems with activities of daily living as a result of pain and exhaustion from her tick borne illness[ which] directly supports their opinions that [Plaintiff] could not sustain work due to an inability to get through the workday without having to take an unreasonable number of rest breaks." (Id. at 24-25.) Plaintiff further maintains that "[t]he ALJ's criticism of [Drs.

_____

symptoms. (See Tr. 451 (containing Dr. Motyka's notation that he "disagree[d] w[ith Dr. Pittman's] treatment but w[ould] provide pain m[anagemen]t [for Plaintiff] while [Dr. Pittman] treats [Plaintiff]"), 810 (reflecting infectious disease specialist Dr. Lisa Hightow's recommendation that Plaintiff discontinue all antibiotics due to lack of evidence of any bacterial infections and noting that her antibiotics dosing carried risk of toxic effect including liver damage and resistance to antibiotics), 948 (documenting Dr. Motyka's advice that Plaintiff wean off all antibiotics).)

Motyka and Pittman], although misplaced as to their opinions, could properly be applied to [Drs. Vognar and Downs] on whom the ALJ placed great weight." (Id. at 25.) Plaintiff faults Dr. Vogner for failing to "explain why Plaintiff could be expected to sit normally in an eight-hour workday; why her walking limitations are 'mild'; and what Dr. Vogner even means by 'mild.'" (Id. (referencing Tr. 1199).) Plaintiff additionally complains that Dr. Downs did "not even offer an opinion on whether [Plaintiff] could sustain standing, walking or lifting, . . . [and failed to] explain the functional consequences of [Plaintiff's] chronic fatigue." (Id. (citing Tr. 1902-04).) Plaintiff thus argues that the ALJ applied inconsistent logic in his "weighing of medical source opinions." (Id. at 26 (citing Majette v. Colvin, No. 5:15CV48, slip op. (E.D.N.C. Feb. 25, 2016) (unpublished)).)

As an initial matter, Plaintiff misinterprets the ALJ's finding that the Motyka/Pittman MSS itself lacked supporting explanations (see Tr. 1625) as a finding that the treatment records of Drs. Motyka and Pittman did not support the opinions on the Motyka/Pittman MSS. (See Docket Entry 11 at 24-26.) However, as discussed above, the ALJ also found that the Motyka/Pittman MSS lacked "consisten[cy] with the medical and other evidence in the record" (which includes the treatment records of Drs. Motyka and

Pittman) (Tr. 1625), and the ALJ supported that finding with substantial evidence.

Moreover, unlike Drs. Motyka and Pittman, whose treatment records did not contain objective medical findings that supported their less-than-sedentary restrictions, Drs. Vognar and Downs each conducted extensive physical examinations of Plaintiff, and reported many normal objective findings which supported their mild to moderate limitations on lifting, carrying, standing, walking, and postural movements, such as intact pulses (see Tr. 1196, 1897), normal gait without an assistive device (see Tr. 1197, 1897), no muscle spasm (see id.), negative straight leg raise test (see Tr. 1197, 1898), largely normal sensation (see Tr. 1197, 1898),[9] intact coordination (see Tr. 1197, 1897), normal and symmetric reflexes (see Tr. 1197-98, 1898), full range of motion (see 1198, 1900-01), ability to heel, toe, and tandem walk and stand on one foot (see Tr. 1198, 1899), and no joint swelling, effusion, erythema, or deformity (see Tr. 1198, 1898). Furthermore, contrary to Plaintiff's allegation (see Docket Entry 11 at 25), Dr. Downs did provide opinions on Plaintiff's abilities to stand, walk, and lift, opining that Plaintiff had no limitations on her ability to lift and carry, and had mild to moderate limitations on her ability to stand and walk (see Tr. 1902-03). Thus, the ALJ did not apply

_____

[9] Dr. Downs noted decreased sensation to light touch only in Plaintiff's fingers and toes. (See Tr. 1898.)

inconsistent logic in his analysis of the opinion evidence of record.

In the end, the ALJ correctly found that the Motyka/Pittman MSS lacked any supporting explanations for its opinions. (See Tr. 1625.) The Motyka/Pittman MSS consists of a preprinted checkbox form without diagnoses, symptoms, or prognosis. (See Tr. 1607-10.) Significantly, in the section of the form requesting Drs. Motyka and Pittman to "describe the aspects of the (1) medical history; (2) clinical findings; (3) laboratory findings; (4) diagnoses . . .; and (5) treatment prescribed with response, and prognosis upon which you based your opinion of [Plaintiff's] functional limitations," Dr. Motyka left that area blank, and Dr. Pittman merely wrote that he "agree[d]" with Dr. Motyka's opinions without providing any basis for his agreement. (Tr. 1610.)

c. <u>Nexus between Normal Examination Findings and Motyka/Pittman MSS</u>

Plaintiff additionally objects that the ALJ "cit[ed] to various negative exam findings, including no acute distress, supple neck, soft abdomen, intact judgment/insight, appropriate mood/affect, and full range of motion in the upper and lower extremities" as part of his rationale for rejecting the Motyka/Pittman MSS. (Docket Entry 11 at 26 (citing Tr. 1625).) In connection with that objection, Plaintiff points out that, "as recognized by the Fourth Circuit in <u>Lewis</u>, normal exam findings

are not a legitimate reason to discount the opinions of a treating doctor unless the ALJ explains why the normal findings are relevant to the claimant's medical condition." (Id. (citing Lewis, 858 F.3d at 869).) According to Plaintiff, she "is predominantly disabled by the pain and fatigue of her chronic tick-borne illness . . . [and r]ange of motion is relevant to orthopaedic issues, not, generally, infectious diseases." (Id. at 27.)

As part of his rationale to discount the Motyka/Pittman MSS, the ALJ noted that "[Plaintiff] generally had full range of motion, a normal gait, and intact strength," and that, "[o]f note, on November 30, 2011, Dr. Motyka assessed [Plaintiff] as well nourished and not in acute distress, with supple neck, soft abdomen, intact judgement/insight, appropriate mood/affect, and full range of motion in the upper and lower extremities." (Tr. 1625.) As the Commissioner argues (see Docket Entry 13 at 16), regardless of the source of Plaintiff's symptoms, i.e., orthopedic impairments or infectious disease, findings of full range of motion, normal gait, and intact strength, undermine Plaintiff's complaints of disabling stiffness, pain, and weakness (see, e.g., Tr. 51-57, 1655, 1657, 1660-62), as well as the sub-sedentary restrictions on the Motyka/Pittman MSS (see Tr. 1607-10). The relevance of those normal findings to Plaintiff's subjective symptoms distinguishes this case from Lewis, where the Fourth

Circuit faulted an ALJ for relying on findings of a normal gait to discount Plaintiff's complaints of left shoulder pain, see <u>Lewis</u>, 858 F.3d at 869 (citing <u>Monroe v. Colvin</u>, 826 F.3d 176, 190 (4th Cir. 2016) ("In citing 'normal' results from pulmonary and respiratory tests and an EEG, the ALJ did not explain why he believed these results had any relevance to the question of what symptoms Monroe suffered from narcolepsy.")).

    d.   <u>Plaintiff's Pain Control</u>

Plaintiff also challenges the ALJ's statement that, "'at points in the record,' Plaintiff's pain was controlled by medication" as a basis for rejecting the Motyka/Pittman MSS. (<u>See</u> Docket Entry 11 at 27 (quoting Tr. 1625).) According to Plaintiff, "[t]he ALJ's analysis ignores the fact that[,] even when [Plaintiff's] pain was controlled moderately well, her activities were still frequently curtailed," as well as "the fact that [Plaintiff's] pain was also not well controlled at various points in time." (<u>Id.</u>) Plaintiff points out that "[t]he Fourth Circuit stated in <u>Woods</u> that "[a]n ALJ may not consider the type of activities a claimant can perform without also considering the extent to which she can perform them." (<u>Id.</u> at 27-28 (quoting <u>Woods v. Berryhill</u>, 888 F.3d 686, 694 (4th Cir. 2018) (in turn citing <u>Brown</u>, 873 F.3d at 263)).) Plaintiff contends that, "[c]onsistent with th[at] reasoning, an ALJ cannot reject a

treating doctor's opinion based on [a] period of improvement without also looking at periods of regression." (Id. at 28.)

Plaintiff's arguments overlook the key phrase in the ALJ's rationale – "at points in the record" - which clearly signifies that the ALJ acknowledged that other periods of time existed when Plaintiff's pain medications did not control her pain effectively. The ALJ's discussion of the medical evidence also took account of occasions when Plaintiff reported increases in her pain. (See Tr. 1620-22.) Moreover, the ALJ did not "ignore[] the fact that[,] even when [Plaintiff's] pain was controlled moderately well, her activities were still frequently curtailed" (Docket Entry 11 at 27) as, notwithstanding "points in the record" where Plaintiff experienced good pain control, the ALJ included significant restrictions in the RFC to account for Plaintiff's symptoms, such as limitations on lifting, carrying, pushing, pulling, operating hand/foot controls, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, and fingering (see Tr. 1619).

e.   Dr. Yu's Letter

Plaintiff further faults the ALJ for relying on a "To Whom It May Concern" letter dated April 10, 2012, from Dr. Yu, an otolaryngologist who treated Plaintiff from May 2009 to December 2009 for tonsillitis and ear wax (Tr. 1143), as a reason to

discount the Motyka/Pittman MSS.  (See Docket Entry 11 at 28-29.)
In particular, Plaintiff takes issue with the ALJ's reliance on
"the observations of Dr. Yu that [Plaintiff] did not seem to have
any difficulty sitting, standing, walking, handling objects,
hearing, or speaking during Dr. Yu's interactions with her" (Tr.
1625).  (See Docket Entry 11 at 28-29.)  Plaintiff deems the ALJ's
reliance on Dr. Yu's letter "troubling," because "Dr. Yu explicitly
stated [in the letter] that she did not evaluate [Plaintiff's
mental or physical] abilities[,] . . . Dr. Yu specifically state[d]
her treatment was remote in time and for an unrelated issue [to
Plaintiff's allegedly disabling impairments, as well as that] Dr.
Yu is an [otolaryngologist and] not a pain management specialist
or infectious disease doctor."  (Id. at 29.)  According to
Plaintiff, the ALJ's reliance on Dr. Yu's letter runs counter to
the regulatory criteria an ALJ must consider in weighing medical
opinions (see id. (citing 20 C.F.R. § 404.1527(c))), and "looks
like a rationalization for a desired outcome rather than a
legitimate reason for rejecting the opinions of [Drs. Motyka and
Pittman]" (id. at 29).

The ALJ did not reversibly err by including Dr. Yu's letter
among his reasons for discounting the Motyka/Pittman MSS.  First,
the ALJ accurately restated the substance of Dr. Yu's letter,
expressly acknowledging that Dr. Yu made her "observations" that

Plaintiff did not "seem" to have any difficulty sitting, standing, etc., during Dr. Yu's "interactions" with (and not treatment of) Plaintiff. (Tr. 1625.) Second, the ALJ clearly did not treat Dr. Yu's letter as a medical opinion, as he did not separately assign any weight to her statement. (See Tr. 1623-25.) Third, although Dr. Yu's letter certainly does not constitute the most compelling reason to discount the Motyka/Pittman MSS, the ALJ gave four other reasons for that conclusion, all supported by substantial evidence. (See Tr. 1625.) Thus, even if the ALJ erred by including Dr. Yu's letter among his reasons for discounting the Motyka/Pittman MSS, that error qualifies, at most, as harmless under the circumstances. See generally Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result").

In short, Plaintiff's first assignment of error fails as a matter of law.

## 2. Consideration of Plaintiff's Fatigue

In her second and final assignment of error, Plaintiff argues that "[t]he ALJ fail[ed] to build a logical bridge between the RFC assigned and the disjointed recitation of [Plaintiff's] medical history." (Docket Entry 11 at 31 (bold font and single-spacing

omitted and standard capitalization applied).) More specifically, Plaintiff contends that "[o]ne of her primary complaints [wa]s fatigue that prevent[ed] her from getting through a workday without having to take a substantial number of rest breaks[,]" but that "[t]he ALJ never specifically explain[ed] how [Plaintiff's] fatigue [wa]s being accommodated in his RFC" in violation of <u>Mascio v. Colvin</u>, 780 F.3d 632 (4th Cir. 2015). (<u>Id.</u> at 31-32.) Although Plaintiff acknowledges that the ALJ "included a variety of limitations on weight and various exertional maneuvers" in the RFC, Plaintiff asserts that "none of th[ose] limitations . . . would allow [Plaintiff] to take extra rest breaks during the day." (<u>Id.</u> at 32 (citing Tr. 1619).) Plaintiff points out that the VE testified that "employers do not provide breaks beyond the standard 15 minutes in the morning and afternoon and 30 minutes for lunch" or "typically accommodate employees who need to lie down during the workday." (<u>Id.</u> (citing Tr. 1679-81).) That argument fails to establish an entitlement to relief for three reasons.

First, the ALJ expressly acknowledged Plaintiff's complaints of fatigue during his discussion of the medical evidence. (<u>See</u> Tr. 1620 (noting Plaintiff's trip to emergency room with complaints of, <u>inter alia</u>, fatigue), 1622 (discussing Plaintiff's consultation with endocrinologist for fatigue, reports of low energy to pain management specialist and mental health care

professional, and complaint of exhaustion to Dr. Downs), 1623 (documenting Plaintiff's report of fatigue to consultative psychological examiner Dr. Vincent Maginn).)  Second, the ALJ accorded "[s]ubstantial weight" to the opinions of the state agency medical consultants who reviewed Plaintiff's claim prior to the first ALJ's decision (Tr. 1623-24), who each limited Plaintiff to light work with environmental limitations <u>specifically due to her complaints of fatigue</u> (<u>see</u> Tr. 81-82, 103-05).[10]  The ALJ also assigned "substantial weight" to Drs. Vognar and Downs (Tr. 1624), who found that Plaintiff's symptoms, including her fatigue, caused only mild to moderate limitations on her ability to perform certain work-related activities (<u>see</u> Tr. 1199, 1902-03).  Notably, the ALJ's RFC also includes a limitation to light work with postural and environmental restrictions.  (<u>See</u> Tr. 1619.)  Third, the ALJ included the limitation in the RFC that Plaintiff would remain off-task for up to but not including 10 percent of the workday in addition to normal breaks (<u>see</u> <u>id.</u>), which clearly captures Plaintiff's complaints of fatigue to the extent the ALJ found those complaints consistent with the record.

In sum, Plaintiff's second assignment of error fails as a matter of law.

---

[10] The reconsideration-level consultant added postural restrictions due to Plaintiff's "fatigue and malaise." (Tr. 104.)

### III. CONCLUSION

Plaintiff has not established any errors warranting relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 10) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 12) be granted, and that this action be dismissed with prejudice.


                    /s/ L. Patrick Auld
                         **L. Patrick Auld**
              **United States Magistrate Judge**

March 3, 2020